**EXHIBIT A**

STATE OF NEW HAMPSHIRE

GRAFTON COUNTY　　　　　　　　　　　　　　　　　SUPERIOR COURT

CASE: 215-2021-CV-00095

Richard S. Pessetto, 12 Liberty Ln, Grafton, NH 03240

v.

Walmart Inc., 683 Tenney Mountain Hwy, Plymouth, NH 03264

## MOTION TO AMEND COMPLAINT

NOW COMES the plaintiff Richard Pessetto, and respectfully resubmits a Complaint requesting damage relief, with numbering, formatting, and a typo correction, as follows:

## COMPLAINT

I. **Parties**

1. The plaintiff Richard Pessetto of Grafton, NH having the aforementioned address.

2. The defendant Walmart, Inc. is a multinational retail corporation headquartered in Delaware, USA, with a principal place of business in Plymouth, NH having the aforementioned address.

II. **Jurisdiction and Venue**

3. This court has jurisdiction over the defendants and venue is proper because the events giving rise to this lawsuit took place at the defendant's location within Grafton County, New Hampshire having the aforementioned address.

## III. Facts

Facts: Job Information

1. Richard Pessetto was an employee of Walmart, Inc. on July 18th 2020 where he worked at the Plymouth, NH Walmart retail store.

2. Mr. Pessetto's job title on July 18th, 2020 was electronic sales associate.

3. Mr. Poseetto's job position on July 18th, 2020 was in the electronics department.

4. Mr. Pessetto's job duties included offering sales information to store customers, ringing up sales in the electronics department, and stocking electronics.

5. Mr. Pessetto's job duties included securing merchandise with a "spider wrap" item, which is an electronic device affixed to merchandise designed only be unlocked with someone with the appropriate key.

6. Mr. Pessetto's job instructions on July 18th, 2020 included physically distancing from other employees and customers because of Covid-19 pandemic concerns by six feet or more.

7. The physical distancing policy was a corporate policy adopted as performance of an act that pubic policy also encouraged.

8. Mr. Pessetto occasionally worked with contractors which include OSL, a company contracted by Walmart Inc. for the purpose of selling mobile phones. Employees pertaining to this OSL contractor include those by the names of "Erin" and "Ellie".

2

Facts: July 18, 2020 Altercation

9. Mr. Pessetto arrived at the electronics department of the Plymouth Walmart at about 1PM in the afternoon on July 18th 2020.

10. On July 18th 2020, OSL employees named "Erin" and "Ellie" were on location in the electronics department working in the proximity of Mr. Pessetto.

11. Near the middle of the work period, "Erin" approached Mr. Pessetto and asked if he ever thought of killing people. Mr. Pessetto replied with a joking "sure" and talked about a video game he had played, believing that to be a joke.

12. "Erin" corrected Mr. Pessetto that he was serious and added in that he spends lots of time considering the ways he would do it.

13. On that day, "Erin" and "Ellie" approached Mr. Pessetto closer than six feet multiple times.

14. Mr. Pessetto responded to the distance concerns by informing "Erin" and "Ellie" that they should "step back" because of pandemic concerns.

15. "Erin" and "Ellie" responded by saying Mr. Pessetto is "afraid of germs" with a demeaning tone.

16. "Erin" and "Ellie" furthermore responded by both physically hugging Mr. Pessetto. These hugs were entirely uninvited.

17. Mr. Pessetto repeated his concerns sternly with "Erin" and "Ellie" by firmly telling them to stop touching him.

18. Despite such concerns "Erin" and "Ellie" physically touched Mr. Pessetto multiple times throughout the day.

19. "Erin" tangled a number of "spider wraps" by carelessly throwing them in a pile. Later in the night, Mr. Pessetto was performing the job task of untangling the aforementioned spider wrap security devices.

20. "Erin" joined Mr. Pessetto in the task of untangling the spider wraps.

21. During the task, "Ellie" was talking to someone on her cell phone. "Erin" then made a series of noisy non-English sounds from his mouth . Mr. Pessetto was making minor sounds doing his job duty of correctly setting the spider wrap devices.

22. After ending the call, "Ellie" raised her voice expressing aggravation with noise, yelling at both "Erin" and Mr. Pessetto.

23. Mr. Pessetto informed "Ellie" that he believed his job duties were not noisy saying he was "not making noise except for the spider wrap".

24. "Ellie" then intruded into Mr. Pessettos personal space, parroting Mr. Pessetto as one might suppose to make fun of the way he was speaking, as in mimicking or a sarcastic tone.

25. "Ellie" then rubbed her hands on Mr. Pessettos right shoulder, and chest area.

26. "Ellie" then slapped Mr. Pessetto on the right side of the head with the back of her right hand as she walked away.

27. "Ellie" and "Erin" left for a few minutes before "Ellie" returned.

28. "Ellie" asked Mr. Pessetto what his problem was after Mr. Pessetto was seen as being angry by the events.

29. Mr. Pessetto replied to "Ellie" with "You hit me, how am I supposed to react?".

30. "Ellie" replied that she did not hit Mr. Pessetto.

31. Mr. Pessetto pointed to the store security camera closest to his position and replied back that the incident is on camera.

32. Ellie then left the area.

33. Mr. Pessetto was physically touched at least 10 times including the above mentioned confrontational incident with Ellie throughout the day, including physical contact by both "Erin" and "Ellie".

34. Mr. Pessetto made a decision to report the confrontational incident with Ellie to management. He maintained a distance from the tho OSL contractors for the following hour.

35. At about 7:15PM, Mr. Pessetto was standing at the right-most register from the employee's perspective in the electronics department serving a customer across the counter.

36. "Erin" approached Mr. Pessetto in a confrontational demeanor and sternly demanded to know what he told to "Ellie" earlier (during their previous moments of conflict and anger).

37. Mr. Pessetto replied to "step away" in pointing out he is helping a customer.

38. "Erin" continued his verbally aggressive remarks, in what was perceived as an unfriendly demeanor of "Erin" by Mr. Pessetto.

39. Mr. Pessetto reached for a radio to call a manager.

40. "Erin" said "Yeah, call a manger, you pussy".

41. Associate Manager "Michelle" answered the call and informed Mr. Pessetto that she was helping a customer and would be there "as soon as she could".

42. Mr. Pessetto then decided it would be okay to wait as there was no immediate danger perceived. He moved to the other side of the electronics department after finishing with the customer.

43. Michelle arrived and Mr. Pessetto reported the conflict. He requested Michelle to "pull the tapes" for evidence of what happened throughout the day. She asked "What tapes"

44. Mr. Pessetto then pointed to multiple cameras and said "the tapes, from all these cameras".

45. About five minutes later, Michelle provided a blank piece of paper to Mr. Pessetto and asked him to go to HR to write a statement of events.

46. "Erin" backed away with "Ellie", going to talk to a lawn and garden department employee. They looked in Mr. Pessettos direction and laughed.

47. Mr. Pessetto went from the electronics department to an office room and wrote a statement of events for the HR department.

48. Michelle asked Mr. Pessetto to leave the store and not return until an investigation was done.

49. Mr. Pessetto then left work before his shift was scheduled to end, at about 7:30PM.

Facts After Incident:

50. Mr. Pessetto had difficulty sleeping for a number of days after the incident while considering the comments of homicidal thoughts shared by "Erin".

51. The next morning, July 19th 2020, Mr. Pessetto followed up with Walmart Inc. management, calling them about 10AM. Mr. Pessetto spoke to a manager named "Lisa", telling her about the incident and asked for the email address for another Walmart staff member named Michelle who was to handle the issue.

52. On July 19 at 10:10AM Mr. Pessetto sent a text message with the following text to 6032177421, on July 19th 2020 at 10:10AM with the following:

"This is Shane Pessetto and I would like to provide additional information about the incident that occurred yesterday, July 18th 2021. This didn't really resonate until later that day while at home and now in retrospect, I feel it. is very important to add. Me and Erin were standing near the cart with the clearance stuff when he asked me if I ever had thoughts of killing people. At first I thought it was a joke and I replied, sure, I kill people all the time in GTA, usually cops. This is a video game. But when I realized he was being serious, I asked if he thought about killing people. He replied that he did and went further to talk about thinking about how he would kill

people. I replied that No, I didnt fantasize about killing people. He replied by saying he didn't fantasize about it exactly, but often thought about it. Now after the incident where he showed aggression towards me, which prompted me to call management to electronics and the possibility of retaliation, I have great concerns about that conversation that occurred before the incident."

53. Mr. Pessetto now reports as a correction that he intended to type "July 18th 2020" into the aforementioned text message rather than "July 18th 2021".

54. On July 25 Mr. Pessetto called out a sick day from Walmart and received confirmation number 161827897.

55. Mr. Pessetto's reason for calling out was concerns about homicidal thoughts by "Erin".

56. By August 6th, Walmart Inc. had deposited a payment, but then removed it from his bank account. Furthermore, he was unable to log into the Walmart employee computer system. This caused concern for Mr. Pessetto who then decided to contact Walmart Inc. again.

57. On the morning of August 6th, Mr. Pessetto called "Mary" in the HR department of the Plymouth store who had no information. The night of August 6th Mr. Pessetto reached a manager named "Patrick".

58. "Patrick" informed Mr. Pessetto that his employment was terminated on August 1st for a "verbal altercation with OSL".

59. Mr. Pessetto told Patrick that there will be a legal issue and he needs to "pull the tapes".

60. "Patrick" told Mr. Pessetto that he was busy and would back to him as late as the following day.

61. Walmart Inc. then abandoned their commitment to retrieve the evidence and never got back to Mr. Pessetto with the evidence request.

Facts: Unlawful Behavior and Malice

62. Common law provides that one is protected in their employment in the process of performing an act that public policy would encourage, which would include the social distancing policy as set by Walmart Inc.

63. Common law provides that one is protected from workplace retaliation for reporting a violation of law.

64. New Hampshire Law furthermore reinforces that one is protected from retaliation of complaints of wrongdoing through §275:38-a Non-Retaliation Provision and also the Whistleblower Protection act (RSA §275-E:2).

65. The wanton termination by Walmart Inc. of Mr. Pessetto was hostile, and malicious with negligent and abandoned investigation by Walmart Inc. Such an investigation is expected by Mr.

66. Pessetto to reveal him as purely the victim of assault. This precedent of unlawful behavior is established in part by the court decision of Stewart vs. Bader, 154 N.H. 75, 87 (2006) in disallowing "wanton, malicious, or oppressive" employment terminations.

67. The wanton termination by Walmart Inc. of Mr. Pessetto by simply discharging all employees involved in the altercation at the expense of the victim, Mr. Pessetto, show willful and reckless disregard of the charging parties rights.

68. The disloyal and dishonorable abandonment by Walmart Inc. during Mr. Pessetto's time of emotional distress to investigate repeated requests to Walmart Inc. managers for video evidence shows neglect, oppression, and malice intent by Walmart Inc.

69. The deposit, then retraction, then later re-deposit of Mr. Pessetto's pay after complaint is evidence of malice intent and/or neglect by Walmart Inc.

Facts: Damages:

70. Mr. Pessetto was physically assaulted many times by OSL agents, resulting in emotional distress. This distress was greatly compounded by the wrongful termination by Walmart Inc. acting in bad faith and malice, by wrongful retaliation due the assaults complaint, in clear violation of morals, ethics, and laws.

REQUEST FOR RELIEF:

WHEREFORE, the plaintiff Shane Pessetto respectfully prays this Honorable Court:

A. Schedule this matter for trial, and after trial;

B. Find the defendant liable for wrongful discharge;

C. Award the plaintiff damages for lost wages;

D. Award the plaintiff damages for emotional distress, humiliation, inconvenience and loss of enjoyment of life. Emotional distress damages are equal or greater than the District of New Hampshire case McPadden v. Wal-Mart Case 14-CV-475-SM in which McPadden suffered emotional distress from being targeted for termination by Walmart Inc. for unlawful reasons. McPadden was awarded $500,000 in compensatory damages. We request a similar enhanced compensatory damage under RSA 354-A:21-a, RSA 507:7-d, and reinforced similarly by 42 U.S.C. Section 1981a(b)(3)(D). And;

E. Grant such other and further relief as just and equitable.

Respectfully submitted,                Richard S. Pessetto


Date: April 9, 2021                    by: /s/ Richard Pessetto

                                       Richard Pessetto

                                       12 Liberty Ln

                                       Grafton, NH 03240

                                       legal@quillcode.com